Slip Op 08 - 34

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| EKINCILER DEMIR VE CELIK SANYI A.S. and EKINCILER DIS TACARET A.S., | : : : |
| Plaintiffs, | : : |
| v. | : : |
| UNITED STATES OF AMERICA, | : : |
| Defendant, | : : |
| and | : : |
| NUCOR CORPORATION, GERDAU AMERISTEEL, INC., and COMMERCIAL METALS CO., | : : : : |
| Defendant-Intervenors. | : : : |

Before: **MUSGRAVE, Senior Judge**
Court No. 06-00440

[Plaintiffs' USCIT Rule 56.2 motion contesting final results of antidumping duty administrative review determination concerning steel concrete reinforcing bars from Turkey denied, judgment for defendant.]

## OPINION

Decided: March 20, 2008

*Arent Fox LLP* (*Myles S. Getlan* and *Matthew M. Nolan*), for the plaintiffs.

*Jeffrey S. Bucholtz*, Acting Assistant Attorney General, Civil Division, United States Department of Justice, *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Richard P. Schroeder*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Scott D. McBride*), of counsel, for the defendant.

*Wiley Rein LLP* (*John R. Shane*, *Alan H. Price* and *Maureen E. Thorson*), for the defendant-intervenors.

Ekinciler Demir ve Celik Sanyi A.S. and Ekinciler Dis Tacaret A.S. ("Ekinciler"), producer and exporter of Turkish rebar, challenge two aspects of an administrative review conducted by the U.S. Department of Commerce, International Trade Administration ("Commerce") of an outstanding antidumping duty order on imports of that product. *See Certain Steel Concrete Reinforcing Bars from Turkey; Final Results and Rescission of Antidumping Duty Administrative Review in Part*, 71 Fed. Reg. 65082 (Nov. 7, 2006) ("*Final Results*"), as amended at 71 Fed. Reg. 75711 (Dec. 18, 2006) ("*Amended Final Results*"). The review period is April 1, 2004 to March 31, 2005 ("POR"). Their Complaint alleges Commerce (1) incorrectly imputed depreciation to a non-depreciable accounting item when calculating Ekinciler's cost of production, and (2) incorrectly treated a ceremonial first-sale from a newly constructed plant as normal when the sale should have been disregarded from the home market sales data base. The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii) to hold unlawful in accordance with 19 U.S.C. § 1516a(b)(1)(B)(i) any determination "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" For the following reasons, the plaintiffs' USCIT Rule 56.2 motion for judgment must be denied and the matter dismissed.

### *Discussion*

### I. Imputed Depreciation

The first issue concerns the appropriateness of imputing depreciation to a particular account (the "disputed account") that was included in a list of fixed assets Ekinciler provided to Commerce.[1]

---

[1] The court was eventually able to discern evidence of the particular account in the record from an *n*-th photo-iteration of that 17-page asset schedule listing over 1,400 such accounts and reduced to near illegibility at a less-than-six-point font.

The relevant statute provides that Commerce shall normally calculate costs based on the responding

exporter's or producer's records if such records are kept in accordance with generally accepted

accounting principles (GAAP) of the exporting or producing country and "reasonably reflect the

costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). For

such calculation, Commerce

> shall consider all available evidence on the proper allocation of costs,
> including that which is made available by the exporter or producer on a
> timely basis, if such allocations have been historically used by the exporter
> or producer, in particular for establishing appropriate amortization and
> depreciation periods, and allowances for capital expenditures and other
> development costs.

*Id*. *See*, *e.g.*, *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 526, 533,

717 F.Supp. 834, 841 (1989) (sustaining Commerce's use of a firm's reported expenses so long as

the firm's financial statements are prepared in accordance with home country GAAP and do not

significantly distort the firm's financial position or actual costs).

After the fact-gathering stage of the proceeding had ended, ostensibly, the petitioners prodded

Commerce to require Ekinciler to explain its claimed depreciation expense in relation to the total

book value of its assets. Responding to the supplemental questionnaire to that effect, Ekinciler

provided the aforementioned list of its fixed assets and asserted that the claimed expense was correct

and that certain assets retaining book value were not depreciable in accordance with general and/or

Turkish GAAP (including construction-in-process assets, assets already fully depreciated, land,

defective and unused assets, assets sold during the period, and the disputed account). PDoc 268,

CDoc 109 (June 7, 2006). With respect to the disputed account, Ekinciler claimed that it did not

relate to the construction of assets, encompassed an amount incurred over a period unrelated to the

POR, and had no depreciation taken on it since its inception.  *Id*. at 3.  *See id*. at Ex. D-80.

In the preliminary determination, Commerce relied on Ekinciler's reported depreciation

expenses and found that Ekinciler had not engaged in dumping.  *Certain Steel Concrete Reinforcing*

*Bars from Turkey; Preliminary Results and Partial Rescission of Antidumping Duty Administrative*

*Review*, 71 Fed. Reg. 26455 (May 5, 2006).  *See* PDoc. 240, CDoc 99 (May 1, 2006).  In their

comments on the preliminary results, the petitioners complained that Ekinciler had neither detailed

the nature of the disputed account nor explained why it was not included in its depreciation expense

calculation.  PDoc 286, CDoc 116, at 9 (June 29, 2006).  Ekinciler responded that it had, and it

reiterated its earlier statement on the matter, further arguing that if Commerce believed the record

to be incomplete on this point then it should permit Ekinciler the opportunity to cure any deficiencies

in the record concerning its depreciation expenses.  PDoc 301, CDoc. 123 (July 18, 2006).  *See* 19

U.S.C. § 1677m(d).

After the parties submitted their administrative case and rebuttal briefs, it appears Ekinciler

attempted to supplement the record in August 2006 to support its contention that the disputed

account was not depreciable.  *Cf*. PDoc 308 (Aug. 24, 2006).  Commerce rejected the submission

on the ground that it "represents new and untimely filed written argument."  *Id*.

For the *Final Results*, Commerce found Ekinciler's books and records in accordance with

Turkish GAAP, *i.e.*, tax law, but determined its depreciation methodology unreasonable with respect

to certain fixed assets that had been revalued in accordance with Turkish GAAP on the ground that

the methodology did not systematically and rationally recognize the cost of depreciation over the

assets' useful lives. *See* PDoc 316 at cmt 11 (referencing Patrick R. Delaney, Barry J. Epstein, Ralph Nach, and Susan W. Budack, *Wiley GAAP: Interpretation and Application of Generally Accepted Accounting Principles* (2002 ed.) ("*Wiley GAAP Guide*") at 350; Charles T. Horngren and Walter T. Harrison, Jr., *Accounting* (2d ed. 1992) at 456. Commerce thus adjusted the depreciation expense for such assets. Relevant here is the fact that Commerce imputed depreciation to the disputed account on the ground that Ekinciler had listed it among the "plant, machinery and equipment" ("PME") assets and it is "inherent that an asset recorded in the [PME] category is related to those types of fixed assets and accordingly should be depreciated." *Id.* This adjustment increased Ekinclier's fixed overhead expenses and total cost of manufacturing considerably. *See Final Results* and accompanying *Issues and Decision Memorandum* at cmt 1; PDoc 313, CDoc 129 (Nov. 1, 2006).

Before the court, each party claims the other's record evidence on the depreciability of the disputed account amounts to mere conclusory conjecture. Ekinciler points out that Commerce did not find Ekinciler's treatment of the disputed account inconsistent with Turkish GAAP nor did it impute depreciation to certain other assets claimed as nondepreciable (land, assets not used or defected, assets awaiting sale). Ekinciler argues that Commerce failed to distinguish the disputed account from these other assets and that the explanation of the disputed account, provided in its response to the fourth supplemental questionnaire, suffices to establish that the account was not depreciable in accordance with GAAP because, as explained, the disputed account was not related to the construction of an asset, had been incurred over a period unrelated to the costs of production of the POR, and had not had depreciation allocated to it in the past. *Cf.* 19 U.S.C. § 1677b(f)(1)(A) (Commerce "shall consider all available evidence on the proper allocation of costs . . . if such

allocations have been historically used by the exporter or producer . . . "); 19 C.F.R. §

351.102(b)(21) ("'Factual information' means: (i) Initial and supplemental questionnaire responses;

(ii) Data or statements of fact in support of allegations; (iii) Other data or statements of facts; and

(iv) Documentary evidence").  Ekinciler further argues any perceived deficiency in the administrative

record resulted from the defendant intervenors' and Commerce's game of "gotcha" because the

depreciation issue was raised at the eleventh-hour and ostensibly after the fact-gathering stage of the

proceeding had passed, and it further contends Commerce should have had implicit notice that the

account is not a proper PME asset by virtue of (1) the claim that the account did not relate to the

construction of an asset, (2) the fact that the asset schedule contains no assets acquired or built in

2000 and 2001 that could reasonably be related to the disputed account,[2] and (3) the fact that

Ekinciler has never depreciated the account.  The government and the defendant intervenors argue

nothing was "lacking" in Ekinciler's response on the matter and thus there was no need for

Commerce to engage in a deficiency analysis pursuant to 19 U.S.C. § 1677m(d).

    As a preliminary matter, it is worth observing that "capitalization" refers to the treatment of

expenditures for accounting purposes as assets, that "property, plant and equipment" appears to be

a common accounting term encompassing all productive assets including land, and that

"depreciation" is something of a misnomer because it is an attempt to allocate asset cost to the

accounting periods benefitted rather than an attempt to value such assets.  *See*, *e.g.*, John A. Tracy,

---

[2]  The record reflects that only one "minor" asset was acquired in 2001 and it is not in the
same asset category as the disputed account.

*Accounting for Dummies*, *passim* (3d ed. 2005).[3]  Ekinciler's PME asset group is apparently a subset of the broader asset group "property, plant and equipment."   This is an important distinction. Ekinciler listed a number of nondepreciable assets to support its contention that the disputed account was not depreciable, but the record seems to show that the disputed account was the only item in the "PME" asset group that had not been depreciated.  *See* CDoc 109 at 2-3 & Ex. D-80.  Commerce did not make an explicit determination of what the disputed account actually represents; on the other hand, the account's English translation arguably gave Commerce notice, as Ekinciler implies, that the account should necessarily be related to one or more other accounts, and, as Ekinciler argues, the record reveals no assets that were constructed or acquired during the period(s) when the amount of the disputed account was purportedly incurred that could reasonably be said to relate thereto.

To support its contention that the disputed account was not depreciable, Ekinciler relies on Statement of Financial Accounting Standards No. 34 (Financial Accounting Standards Board) (capitalization of interest cost) and International Accounting Standards ("IAS") No. 23 (International Accounting Standards Board) (borrowing costs directly attributable to the acquisition, construction or production of a qualifying asset are to be capitalized as part of the cost of such asset).[4]  These

---

[3]  *See also*, *e.g.*, *Wiley GAAP Guide* at 45-46, 69; Barry J. Epstein and Abbas Ali Mirza, *Wiley IAS: Interpretation and Application of International Accounting Standards* at 292 (2002 ed.).

[4]  FAS 34 explains that it is appropriate to capitalize the cost of interest if the effect of capitalization, compared with the effect of expensing, is "material" and states at paragraph 7 that "[t]he objectives of capitalizing interest are (a) to obtain a measure of acquisition cost that more closely reflects the enterprise's total investment in the asset, and (b) to charge a cost that relates to the acquisition of a resource that will benefit future periods against revenues of the periods benefitted[,]" and at paragraph 9 that interest "shall be capitalized" for "[a]ssets that are constructed or otherwise produced for an enterprise's own use" and for "[a]ssets intended for sale or lease."  The court would rather avoid delving into minutiae, but the government points out that Ekinciler only
(continued...)

pronouncements provide only marginal support, however, insofar as they indicate that capitalization is appropriate when costs are related to the construction or acquisition of assets, the only other alternative therein discussed being expensing of cost during the period incurred, and also to the extent one may extrapolate from them that the existence of an asset, tangible or intangible, is a prerequisite to capitalizing an amount expended therefor.  But it does not logically follow that capitalization is only limited to construction or acquisition of assets or that a capitalized account can avoid being allocated to production over time; whether that is actually the case, these pronouncements do not lead to the inevitable conclusion that the disputed account, originally declared to be "capitalized" as well as a PME asset, was not a depreciable "fixed asset" or that depreciation did not properly apply thereto.

Similarly, Ekinciler claims there is no support on the record for Commerce to state that it is "inherent that an asset recorded in the [PME] category is related to those types of fixed assets and accordingly should be depreciated[,]" but at the same time Ekinciler does not appear to dispute the general principle of depreciating fixed assets under GAAP.  *Cf.* Complaint *with* PDoc 316 at cmt 11

---

[4] (...continued)
claimed the account did not relate to the *construction* of an asset and did not separately claim that the account did not relate to the *acquisition* of an asset so therefore Commerce's conclusion was reasonable and Ekinciler did not exhaust its administrative remedy with respect to the argument. *E.g.*, Def.'s Br. at 16.  The defendant intervenors also again stress that Ekinciler was "on notice" that the issue was important in this proceeding because Ekinciler had made similar arguments with respect to the same matter in a previous review segment of the proceeding and that Commerce had nonetheless adjusted Ekinciler's cost of manufacturing to reflect "appropriate" depreciation expenses during that period of review.  *See* PDoc 286, CDoc 116, at 9.  The court considers the first point a matter of semantics rather than a valid distinction of Ekinciler's administrative position, *cf.* FAS 34 ¶ 7 (acquisition) *with* ¶ 9.a. (construction), and the second point appears gratuitous.  That (the 1999-2000 administrative review) was then, this is now, and the petitioners' stated reasons for urging Commerce to delve into depreciation at all was ostensibly due to the "*new* accounting treatment of revalued assets" under Turkish tax law.  *Cf.* PDoc 251, CDoc 106, *supra* at 3 (italics added).

(imputing depreciation to certain other fixed assets). In accordance with 19 U.S.C. § 1677b(f)(1)(A), Commerce was obligated to consider that the amount of the disputed account was expended over a period unrelated to the costs of production of the POR and that historically the disputed account has not been depreciated, but the court is unable to conclude that these facts conclusively establish that the "proper" accounting treatment of the disputed account is nondepreciability under Turkish or other GAAP or that the statute precluded Commerce from disagreeing with Ekinciler's nondepreciability claim, particularly given that the burden was on Ekinciler to create an adequate record as to the disputed account's nondepreciability. *See, e.g.*, *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 936, 806 F.Supp. 1008, 1015 (1992); *Chinsung Indus. Co. v. United States*, 13 CIT 103, 705 F.Supp. 598 (1989). The court sympathizes with Ekinciler's position, but the problem at this stage appears to be that Ekinciler initially declared the disputed account to be a capitalized PME fixed asset in its own right. *See* CDoc 109 at 3. The administrative record does not otherwise conclusively establish that an account declared as capitalized is an accepted exception to the general accounting principle that fixed assets incur depreciation or that carrying the account on Ekinciler's books as a PME fixed asset should have been considered, obviously or implicitly, incorrect as a matter of accounting categorization or principle or law, and therefore the declaration that the disputed account is a capitalized PME fixed asset amounts to substantial evidence on the record to support Commerce's decision to impute depreciation thereto. After considering the administrative record, the court is unable to conclude that Ekinciler's description and explanation of the disputed account at the administrative review was inherently insufficient such that further analysis was required pursuant to 19 U.S.C. § 1677m(d) or that Commerce erred in rejecting Ekinciler's

subsequent attempt for supplementation as untimely under 19 U.S.C. § 1677m(e). The record

therefore contains substantial evidence to support Commerce's determination to impute depreciation

to the disputed account.

## II.  Normality of Home Market Sale

The second issue is whether Commerce should have considered a single home market sale

by Ekinciler to have been aberrant. Commerce must exclude from the antidumping analysis any

comparative market sales that have not been made in the "ordinary course of trade" as defined by

19 U.S.C. § 1677(15). Those include sales below the cost of production. *See* 19 U.S.C. §§

1677(15)(A), 1677b(b)(1). Due to a large increase in below-cost sales eliminated from Commerce's

analysis after the preliminary review results, the particular and allegedly aberrant sale took on added

significance in the *Final Results*.

After issuance of those results, as part of its comments thereon Ekinciler argued that the sale

in question had been a ceremonial "first sale" from a new plant that was priced significantly higher

than the average price of all other sales during the POR, that Commerce's methodology should have

excluded it, and that a ministerial correction was therefore necessary to treat the sale as

extraordinary. PDoc 346, CDoc 140 at 4-7 (Nov. 13, 2006). Ekinciler argues Commerce's decision

not to treat the sale as extraordinary is unreasonable because (a) the antidumping statute does not

impose upon respondents the obligation to anticipate how Commerce may calculate dumping

margins in final results based upon any particular argument made by a petitioner during the course

of a proceeding, (b) the petitioners in this instance did not raise their depreciation-related arguments

until after the preliminary results, and (c) Ekinciler could not have been expected to anticipate that

an issue would be relevant for the final margin calculations based on how Commerce decided a similar issue five years earlier.

The problem with this contention, similarly, is that for this review Ekinciler included the disputed sale in its home market sales data without treating it as aberrant, and Ekinciler does not appear to have provided any evidence regarding the sale's allegedly unusual circumstances or argument that it was outside the ordinary course of trade until the *Final Results* were issued, as Commerce observed. *See* PDoc 363 at 7 (Dec. 12, 2006). Commerce determined that the alleged error was actually a challenge to methodology and therefore it declined to make the requested correction on the ground that the issue of the sale's nature should have been raised earlier in the proceeding, not as a ministerial error after issuance of the *Final Results*. The court cannot fault such reasoning: a sale is either normal or abnormal, and in the context of an antidumping analysis, the methodology therefor is not unknown. *See* 19 U.S.C. § 1677b(b). The normality of a sale thus depends upon the methodology undertaken in the final analysis, and it does not depend upon or await the final results thereof. Such "final" results may only be amended pursuant to 19 U.S.C. § 1675(h) for ministerial errors, *i.e.*, "errors in addition, subtraction, or other arithmetic function," in contrast to errors of data qualification or methodology, *e.g.*, whether a sale is normal or abnormal. The court must therefore conclude that Ekinciler failed to exhaust its administrative remedies with respect to the issue, *see* 28 U.S.C. § 2637(d), and it must also decline, with regrets, Ekinciler's invitation to exercise discretion notwithstanding, in order to consider the claim and the nature of the sale, on the ground that the court cannot perceive a standard from which to adjudge the alleged unfairness of the size of the margin.

### *Conclusion*

In view of the foregoing, Ekinciler's motion for judgment upon the agency record must be denied and this action dismissed.  Judgment will enter accordingly.


_____/s/  R. Kenton Musgrave_____
R.  KENTON MUSGRAVE, Senior Judge

Dated: March 20, 2008
      New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| EKINCILER DEMIR VE CELIK SANYI A.S. and EKINCILER DIS TACARET A.S., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: **MUSGRAVE, Senior Judge** |
| | : | Court No. 06-00440 |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| NUCOR CORPORATION, GERDAU AMERISTEEL, INC., and COMMERCIAL METALS CO., | : | |
| | : | |
| Defendant-Intervenors. | : | |

## JUDGMENT

This action having been submitted for decision, and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is

**ORDERED** that Plaintiffs' motion for judgment on the administrative record of this matter be, and it hereby is, denied, and it is further

**ORDERED** that *Certain Steel Concrete Reinforcing Bars from Turkey; Final Results and Rescission of Antidumping Duty Administrative Review in Part*, 71 Fed. Reg. 65082 (Nov. 7, 2006), as amended at 71 Fed. Reg. 75711 (Dec. 18, 2006), be, and they hereby are, sustained with respect to the Plaintiffs, and it is further

**ORDERED** that all issues in this matter having been decided, the action be dismissed.

_/s/  R. Kenton Musgrave_
R.  KENTON MUSGRAVE, Senior Judge

Dated: March 20, 2008
New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk